# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# NUMBER 2021 CA 0201

## JEFF HUGHES

### VERSUS

## CAPITAL CITY PRESS, L.L.C. D/B/A THE ADVOCATE

Judgment Rendered: _____DEC 0 7 2021_____

Appealed from the
Eighteenth Judicial District Court
In and for the Parish of Iberville
State of Louisiana
Docket Number 79,978, Div. A

The Honorable J. Kevin Kimball, Judge Presiding

| | |
|---|---|
| Scott L. Sternberg<br>Marcia Suzanne Montero<br>Michael S. Finkelstein<br>Graham Williams<br>New Orleans, LA | Counsel for Defendant/Appellant,<br>Capital City Press, L.L.C. d/b/a<br>The Advocate |
| John H. Smith<br>Loren D. Shanklin<br>Alicia M. Sosa<br>Baton Rouge, LA | Counsel for Plaintiff/Appellee,<br>Jeff Hughes |
| Ford Barry Marionneaux<br>Elizabeth M. Mayeaux<br>Plaquemine, LA | |
| Anthony M. "Tony" Clayton<br>Port Allen, LA | |
| Katie M. Schwartzmann<br>New Orleans, LA | Amicus Curiae Counsel for<br>Reporters Committee for Freedom<br>of the Press |

BEFORE: LANIER, WOLFE, AND WILLIAMS,[1] JJ.

---

[1] Retired Chief Judge Felicia Toney Williams, serving as judge *ad hoc* by special appointment of the Louisiana Supreme Court.

**WILLIAMS, J.**

In this defamation action, defendant, Capital City Press, L.L.C. d/b/a The Advocate ("*The Advocate*"), appeals from the judgment of the trial court, denying its special motion to strike pursuant to La. C.C.P. art. 971, known as Louisiana's anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute,[2] and awarding plaintiff, Jeff Hughes ("Justice Hughes"), $5,000.00 in attorney's fees, in addition to court costs.[3] For the following reasons, we affirm and we award $7,500.00 to Justice Hughes for defense of this appeal.

## FACTS AND PROCEDURAL HISTORY

On June 25, 2019, *The Advocate*, a daily Baton Rouge newspaper, published an article about plaintiff, Justice Hughes, currently an Associate Justice of the Louisiana Supreme Court, and his actions as the presiding judge over a child custody case (hereinafter "the Nicholson custody case") in 1998 and 1999, when he was a district court judge at the Twenty-first Judicial District Court for Livingston, St. Helena, and Tangipahoa Parishes. The article, which was published in the "Opinion" section[4] of *The Advocate*, was entitled "Jeff Hughes has made a mockery of justice[.]" The June 25, 2019 article stated:

> As a justice of the Louisiana Supreme Court, Jeff Hughes is supposed to embody the highest standards of judicial conduct.
>
> He failed that standard miserably two decades ago when he presided over a controversial custody case while he was, according to several people, romantically involved with one of its lawyers.
>
> His behavior, brought to light this week by an Advocate investigation of the long-ago legal battle, should alarm voters who have elected him to the state's highest court. Maybe they would have made another

---

[2] Louisiana Code of Civil Procedure article 971 was enacted by 1999 La. Acts, No. 734, § 1. Anti-SLAPP statutes typically apply in cases where a litigant alleges defamation, in an effort to chill the First Amendment speech of its target. See *Stabiler v. Louisiana Business, Inc.*, 2016-1182 (La. App. 1st Cir. 9/26/17), 232 So. 3d 555, 557 n. 1, *writ denied*, 2017-1824 (La. 12/15/17), 231 So. 3d 639.

[3] The judgment was designated as a final judgment pursuant to La. Code Civ. P. art. 1915(B).

[4] The June 25, 2019 article does not contain the author's name.

2

decision if they had known of Hughes' sordid conduct, which attracted the attention of the FBI when he was a state judge in Livingston Parish.

The fact that citizens generally didn't known about it is an even bigger scandal. It points to a pervasive lack of transparency in Louisiana's judicial system – a problem that hampers accountability and compromises confidence in how justice is carried out.

Some of the details of the custody dispute are mentioned in an unrelated court case. That information, along with other documents The Advocate located, form the basis of what we know. Some documents were suspiciously missing from the official record. And, since the records of the state's Judiciary Commission, which disciplines judges for bad behavior, aren't routinely made public, we don't know what, if anything, was done to address Hughes's clearly unethical behavior.

The facts that have made it into the light of day read like a horror story. In 1999, while on the state bench in Livingston, Hughes was romantically involved with lawyer Berkley Durbin, according to several people familiar with the situation. Even so, he didn't recuse himself from a custody case and related legal matters involving a five-year-old boy named Austin Nicholson. Durbin represented Austin's mother, who was fighting for custody even though her boyfriend, who would become her husband, had been accused of scalding Austin in a tub of hot water.

Hughes refused to recuse himself and ruled in favor of Austin's mother, though child welfare officials strenuously objected. The case was eventually turned over to another judge, and in 2004, Hughes wrote a note to the boy's grandmother in which he appeared to apologize for his conduct, saying it was "inimical to the pursuit of the truth and that, because of my actions, justice suffered. For this, I am deeply remorseful."

If Hughes were truly remorseful, he'd speak publicly about the case, which prompted an FBI probe that ultimately did not produce any charges against him.

Sadly, without basic transparency, the public doesn't know how many other abuses have occurred in Louisiana's judiciary and what was done about them.

State lawmakers had a chance last session to approve a bill making the records of the judiciary commission public. They balked, no doubt because many legislators are lawyers who are friends of judges or aspire to the bench themselves.

Austin Nicholson, now grown, survived his ordeal and now lives out of state. But Jeff Hughes failed him, and the system did, too. Until more light is shed on the Louisiana judiciary's dirty dealings, we can expect more victims like Nicholson in the future.

On June 23, 2020, Justice Hughes filed this defamation action against *The Advocate*, alleging *The Advocate* published a series of articles in 2019 that were designed to cast him in a negative light. In particular, Justice Hughes alleged the June 25, 2019 article contained false and defamatory language, as it stated that at the time he refused to recuse himself from the Nicholson custody case, and ruled in favor of the mother, he was romantically involved with her lawyer, Berkley Durbin. Justice Hughes further alleged at the time *The Advocate* published the June 25, 2019 article, it had actual knowledge, as evidenced by its previously published June 23, 2019 article, that Durbin had withdrawn from the Nicholson custody case over seven months before he granted custody to the mother. Accordingly, Justice Hughes alleged the June 25, 2019 article was published with actual malice because *The Advocate* had knowledge that the defamatory statements were false, or acted with reckless disregard as to whether or not they were false. Justice Hughes alleged he met with the editors and reporters for *The Advocate* and requested a correction, but *The Advocate* refused, and continued to publish additional articles implying Justice Hughes had acted unethically. Justice Hughes alleged *The Advocate*'s repeated publication of the unflattering articles in 2019 was premised on the defamatory statements in the June 25, 2019 excerpt, a fact that he argued further demonstrates *The Advocate* acted with actual malice. Justice Hughes alleged, as a public official and the elected Louisiana Supreme Court Justice for Livingston, Ascension, Iberville, East and West Baton Rouge, Pointe Coupee, and East and West Feliciana Parishes, he suffered embarrassment and damage to his reputation in these parishes, and others, based on *The Advocate*'s publication of the defamatory articles.

On July 9, 2020, Justice Hughes filed a "Plaintiff's Motion Pursuant to Louisiana Code of Civil Procedure Article 971" seeking a determination from the trial court that his cause of action against *The Advocate* is not subject to a special

4

motion to strike under La. C.C.P. art. 971. Justice Hughes asserted he had established a probability of success on his defamation claim based on the false statements contained in *The Advocate*'s June 25, 2019 article indicating he refused to recuse himself from the Nicholson custody case and ruled in favor of the mother while romantically involved with her attorney. Justice Hughes attached several documents to his Article 971 motion, including a copy of the following excerpt from the June 25, 2019 article:

> The facts that have made it into the light of day read like a horror story. In 1999, while on the state bench in Livingston, Hughes was romantically involved with lawyer [redacted], according to several people familiar with the situation. Even so, he didn't recuse himself from a custody case and related legal matters involving a five-year-old boy named Austin Nicholson. [Redacted] represented Austin's mother, who was fighting for custody even though her boyfriend, who would become her husband, had been accused of scalding Austin in a tub of hot water.
>
> * * *
>
> Hughes refused to recuse himself and ruled in favor of Austin's mother, though child welfare officials strenuously[...]

(Emphasis and redactions in original).

Hughes additionally attached a copy of an excerpt of the June 23, 2019 article published by *The Advocate*, which stated:

> By the time of the custody hearing, overseen by Hughes, [redacted] was no longer the lawyer of record. She'd officially left the case in August 1998, court documents show.

(Emphasis and redaction in original).

Justice Hughes also attached the following documents to his Article 971 motion: (1) a certified copy of a motion to substitute counsel of record and attached signed order, dated August 27, 1998, permitting Durbin to withdraw as counsel of record for Kristin M. Fuselier (formerly, Kristen Nicholson),[5] Austin

---

[5] Kristin M. Fuselier is sometimes referred to in the record by her previous married name, Kristin Nicholson, and her first name is sometimes spelled Kristen. For clarity, we will refer to her as Kristin Fuselier throughout this opinion.

Nicholson's mother, in the Nicholson custody case; (2) a certified copy of the court minutes corresponding to the March 24, 1999 custody trial in the Nicholson custody case, which reflect that Kristin Fuselier was represented by attorney W. Robert Gill at the time of the custody trial; (3) a copy of an excerpt from *The Gambit*, a New Orleans newspaper, containing a "CORRECTION" noting the author previously reported that Justice Hughes was romantically involved with the lawyer for a litigant in a child custody case appearing before him in March 1999, but the author had been provided with court documents revealing the attorney in question did not represent the litigant at the time of the custody trial and had withdrawn from the case in August 1998; (4) an affidavit by Jason Harris, Livingston Parish Clerk of Court, who identified and verified the motion and order permitting Durbin to withdraw from the Nicholson custody case on August 27, 1998, and the March 24, 1999 minute entry from the Nicholson custody case; (5) an affidavit by Edward R. Erwin, who attested he is a lifelong resident of Iberville Parish, he has subscribed to *The Advocate* for 42 years, and he receives *The Advocate* daily at his home; and (6) an affidavit by Justice Hughes, wherein he identified the excerpt of the June 25, 2019 article and the excerpt of the June 23, 2019 article published by *The Advocate*, which he attested were delivered to his home in Livingston Parish, and the excerpt of *The Gambit* containing the correction, which he stated was delivered to his New Orleans office.

On August 5, 2020, *The Advocate* filed an answer to Justice Hughes' defamation suit, raising several affirmative defenses, specifically asserting that Justice Hughes cannot prove the complained-of speech is false, or that he suffered damages as a result of *The Advocate*'s publication of the articles at issue. *The Advocate* additionally noted its intention to file a special motion to strike pursuant to Article 971.

6

On August 28, 2020, *The Advocate* filed a "Motion to Strike Plaintiff's Anticipatory La. C.C.P. art. 971 Motion to Strike," arguing Justice Hughes' special motion to strike should be stricken from the record because Article 971 allows the filing of a motion to strike as an affirmative defense, to defeat meritless defamation claims, and not as a means to prevent a defendant from filing a motion to strike under Article 971.

On October 14, 2020, *The Advocate* filed a special motion to strike pursuant to Article 971. *The Advocate* asserted that Justice Hughes cannot demonstrate he has a probability of success on his defamation action because the June 25, 2019 article, including the June 25, 2019 excerpt cited in his Article 971 motion, is true or substantially true. Specifically, *The Advocate* conceded that Durbin withdrew from the Nicholson custody case in August 1998, but asserted that she continued to represent Kristin Fuselier in a child in need of care action, and represented Kristin's boyfriend (later, husband) Marc Fuselier[6] in criminal proceedings stemming from allegations he scalded Austin Nicholson in hot bath water, at the time when Justice Hughes granted Kristin Fuselier custody of Austin. *The Advocate* further argued Justice Hughes cannot prove it acted with actual malice because, as a public figure, he must demonstrate *The Advocate* knowingly published a false statement, or acted with reckless disregard for whether a statement was false, and the July 25, 2019 excerpt did not contain a false statement. Alternatively, *The Advocate* argued Justice Hughes cannot prove he suffered damages because he is barred from running for reelection for Louisiana Supreme Court Justice due to his age, and therefore any claim he lost support from voters due to *The Advocate*'s publication of the 2019 articles is without merit. *The Advocate* also argued Justice Hughes has not alleged a loss of income, and does not

---

[6] Marc Fuselier's first name is sometimes spelled Mark in the record. For clarity, we will refer to him as Marc Fuselier throughout this opinion.

take issue with any other factual statements contained in *The Advocate*'s articles. *The Advocate* sought reasonable attorney's fees and costs, and requested dismissal of Justice Hughes' petition.

*The Advocate* attached to its special motion to strike a copy of the June 25, 2019 article and copies of the articles it published about Justice Hughes on June 23, 2019, July 28, 2019, and August 23, 2019, all of which were identified in an affidavit by Andrea Gallo, an employee of *The Advocate* and one of the authors of the articles. The June 23, 2019 article, written by Gallo, John Simerman, and Katie Moore, noted the reporters discovered Justice Hughes had been the subject of a five-year FBI investigation regarding his conduct as the presiding judge in the Nicholson custody case when they found a motion to recuse Justice Hughes, then Judge Hughes, when he was an appellate judge at the First Circuit Court of Appeal. The motion to recuse, filed by L.J. Hymel, a former United States Attorney, sought to have Justice Hughes recused from a case because Hymel, who was involved with the investigation into Justice Hughes, represented one of the litigants in the case on appeal. A copy of the motion to recuse filed by Hymel, which was mentioned in the July 23, 2019 article, was identified in, and attached to, Gallo's affidavit.

*The Advocate* also attached to its special motion to strike pleadings from the child in need of care proceeding involving Austin Nicholson, which were identified in Gallo's affidavit, and which she stated were provided to her by the Nicholson family. The child in need of care pleadings included a motion to continue, and a motion to dismiss and withdraw, both of which were filed by Durbin on behalf of Marc Fuselier. Notably, the motion to dismiss and withdraw noted that on May 7, 1999, Kristin Fuselier's counsel of record, Robert Gill, was absent for a continued custody hearing and Gill's partner, who was present at the hearing, was unfamiliar with the case, so Durbin enrolled as co-counsel for Kristin

8

Fuselier for the limited purpose of the hearing, and therefore wished to withdraw. Lastly, Gallo identified an attached motion filed in July 1999 by Durbin on behalf of Marc Fuselier in his criminal case. In her affidavit, Gallo attested to her belief that the allegation Justice Hughes ruled on the custody of Austin Nicholson while dating Durbin, who continued to represent Kristin Fuselier and Marc Fuselier in related proceedings, is true based on public records and interviews she and her reporting partner, Simerman, conducted.

On October 21, 2020, Justice Hughes filed an opposition to *The Advocate*'s special motion to strike, incorporating by reference his own Article 971 motion, including exhibits and supporting memorandum, and his petition. In his opposition, Justice Hughes conceded that this is a matter of public interest involving a public figure. Justice Hughes argued *The Advocate* failed to report on the accurate factual circumstances, namely that Durbin represented Marc Fuselier in a separate criminal case, before a different judge, and that over a month after Justice Hughes ruled in the Nicholson custody case, Durbin temporarily enrolled as co-counsel for Kristin Fuselier in a juvenile case presided over by a different judge, in a different division. Justice Hughes attached to his opposition an affidavit by Jason Harris, Livingston Parish Clerk of Court, who attested to the fact the child in need of care petition involving Austin Nicholson was filed on May 3, 1999, and on May 7, 1999, Durbin enrolled as attorney of record for Austin's mother. Harris further stated the child in need of care proceedings were presided over by Judge Ernest Drake.

On November 2, 2020, *The Advocate* filed a reply memorandum in support of its special motion to strike, arguing Justice Hughes cannot demonstrate a

9

probability of success on the merits of his defamation claim because *The Advocate* never published a false statement or acted with actual malice.[7]

On November 5, 2020, a hearing was held on *The Advocate*'s special motion to strike pursuant to Article 971.[8] At the outset, the parties stipulated that Justice Hughes is a public figure for purposes of Article 971(A)(1). Following argument, the trial court denied *The Advocate*'s special motion to strike, finding Justice Hughes had demonstrated a probability of success by showing the June 25, 2019 article contained defamatory statements:

> Well, I've read all the memos, replies, and read as a whole this Court believes that the average reader would definitely take away from the article that Justice Hughes was romantically involved with the mother's attorney on a custody trial that was before him and refused to recuse himself while she was the attorney of record in a case. That's what I think anybody that read the article would take from [it].

Additionally, the trial court found another section of the June 25, 2019 article inaccurately conveyed the notion that at the time Justice Hughes granted custody to Kristin Fuselier, he was romantically involved with her attorney. In particular, the trial court found troubling the second paragraph of the June 25, 2019 article, which read:

> [Justice Hughes] failed that standard miserably two decades ago when he presided over a controversial custody case while he was, according to several people, romantically involved with one of its lawyers.

The trial court also determined, based on the June 23, 2019 article, Justice Hughes had supplied sufficient evidence to show *The Advocate* acted with actual malice because it knew when it published the June 25, 2019 article that Durbin did not

---

[7] On October 28, 2020, *The Advocate* also filed an opposition to Justice Hughes' Article 971 motion, incorporating by reference the arguments made it in its previously filed "Motion to Strike Plaintiff's Anticipatory La. C.C.P. art. 971 Motion to Strike" and its special motion to strike.

[8] Justice Hughes' Article 971 motion was continued without date by agreement of the parties. At the hearing, counsel for Justice Hughes introduced the entire record, including all memoranda and affidavits filed therein. Likewise, counsel for *The Advocate* introduced into evidence its memoranda and exhibits, and sought admission of the motion to recuse filed by Rodney Nicholson in the Nicholson custody case. The trial court admitted all exhibits into evidence.

10

represent Kristin Fuselier at the time Justice Hughes granted her custody of Austin. The trial court then addressed the issue of damages, noting Justice Hughes had not set forth specific proof of damages, but found it was not required under Article 971 "to make an actual determination of damages…it's just probability of success." Furthermore, the trial court determined it was "reasonable to think that based on the article that his reputation has suffered therefor." Thereafter, the trial court awarded Justice Hughes $5,000.00 in attorney's fees, plus court costs.

On November 23, 2020, the trial court signed a written judgment denying *The Advocate*'s special motion to strike, and awarding Justice Hughes $5,000.00 in attorney's fees pursuant to Article 971, in addition to court costs. It is from this judgment that *The Advocate* suspensively appeals. Justice Hughes answered the appeal, seeking to increase the attorney's fees awarded by the trial court, and also asking this court to award additional attorney's fees incurred in connection with this appeal. The Reporters Committee for Freedom of the Press has submitted an *amicus curiae* brief in support of *The Advocate*.

## ASSIGNMENTS OF ERROR

*The Advocate* raises the following assignments of error: (1) the trial court erred by denying its special motion to strike because Justice Hughes failed to demonstrate a likelihood of success on the merits of his defamation action; (2) the trial court erred by finding Justice Hughes was not required to produce proof of damages; (3) the trial court erred by finding *The Advocate* acted with actual malice; and (4) the trial court erred by failing to dismiss Justice Hughes' defamation action with prejudice and by failing to award *The Advocate* attorney's fees and costs under Article 971.

## DISCUSSION

Louisiana Code of Civil Procedure article 971 provides, in pertinent part:

11

A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

(2) In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

(3) If the court determines that the plaintiff has established a probability of success on the claim, that determination shall be admissible in evidence at any later stage of the proceeding.

B. In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs.

* * *

F. As used in this Article, the following terms shall have the meanings ascribed to them below, unless the context clearly indicates otherwise:

(1) "Act in furtherance of a person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue" includes but is not limited to:

* * *

(c) Any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest.

Louisiana Code of Civil Procedure article 971 was enacted by 1999 La. Acts, No. 734, § 1. Section 2 of the Act provides:

The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, it is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly.

Hence, Article 971 was enacted by the legislature as a procedural device to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and

12

petition for redress of grievances. *Thinkstream, Inc. v. Rubin*, 2006-1595 (La. App. 1st Cir. 9/26/07), 971 So. 2d 1092, 1100, *writ denied*, 2007-2113 (La. 1/7/08), 973 So. 2d 730.

In *Thinkstream*, this court explained that Article 971(A)(1) creates a burden-shifting scheme where the mover must initially establish that the cause of action against them arises "from any act [of that person] in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue[.]" *Id.* at 1100 (citing La. C.C.P. art. 971(A)(1)). If the mover can satisfy this initial burden of proof, then the burden shifts to the plaintiff to demonstrate a probability of success on the claim. *Id.*

A ruling on a special motion to strike is reviewed *de novo* on appeal to determine whether the trial court was legally correct. The appellate court gives no special weight to the trial court findings, but exercises its constitutional duty to review questions of law and renders a judgment on the record. *Breen v. Holmes*, 2016-1591 (La. App. 1st Cir. 12/7/17), 236 So. 3d 632, 636, *writ denied*, 2018-0049 (La. 3/2/18), 269 So. 3d 708.

As discussed, the parties stipulated that Justice Hughes is a public figure for purposes of Article 971(A)(1) at the November 5, 2020 hearing on *The Advocate*'s special motion to strike. Accordingly, we find *The Advocate* met its initial burden of proving that Justice Hughes' defamation claim against *The Advocate* arises from its exercise of free speech under the United States or Louisiana Constitution in connection with a public issue. Thus, the burden shifted to Justice Hughes to demonstrate a probability of success on his defamation action. *See Thinkstream*, 971 So. 2d at 1100.

Rooted in Louisiana Civil Code article 2315, defamation is a tort involving the invasion of a person's interest in his or her reputation and good name. *Johnson v. Purpera*, 2020-01175 (La. 5/13/21), 320 So. 3d 374, 386. The question of

13

whether a communication is objectively capable of a defamatory meaning is a legal question for the court. *Sassone v. Elder*, 626 So. 2d 345, 352 (La. 1993). To answer this threshold question, a court must consider the context of the communication and whether the average listener could have reasonably understood the communication to convey the defamatory meaning. *Id.*; *Kosmitis v. Bailey*, 28,585 (La. App. 2d Cir. 12/20/96), 685 So. 2d 1177, 1180.

To prevail on a defamation claim, the plaintiff must prove by a preponderance of the evidence (1) defamatory words, (2) publication, (3) falsity, (4) malice, and (5) resulting injury. *Breen*, 236 So. 3d at 638. Thus, in order to prevail on a defamation claim, a plaintiff must prove "that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages." *Sassone*, 626 So. 2d at 350. If even one of the required elements of the tort is lacking, the claim fails. *Costello v. Hardy*, 2003-1146 (La. 1/21/04), 864 So. 2d 129, 140. Defamatory words are those that harm the reputation of another so as to lower him in the estimation of the community or to deter others from associating with him. *Thinkstream*, 971 So. 2d at 1101. Nonetheless, not all defamatory statements are actionable. Rather, many statements are protected by the First Amendment's guarantee of freedom of speech. *Fitzgerald v. Tucker*, 98-2313 (La. 6/29/99), 737 So. 2d 706, 716. For instance, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S. Ct. 2695, 2706, 111 L. Ed. 2d 1 (1990); *Romero v. Thomson Newspapers (Wisconsin), Inc.*, 94-1105 (La. 1/17/95), 648 So. 2d 866, 870. Additionally, "[s]peech on matters of public concern enjoys enhanced constitutional protection." *Romero*, 648 So. 2d at 869.

14

## Falsity and Actual Malice

*The Advocate* argues in its third assignment of error that Justice Hughes failed to establish a probability of success on his defamation action because the June 25, 2019 article is true, or substantially true, and therefore, there was no evidence *The Advocate* acted with actual malice by publishing the article. We will address these issues first.

In order for a public official to recover damages for defamation, the public official "must establish by clear and convincing evidence that the defamatory statement was made with actual malice, that is, 'with knowledge it was false or with reckless disregard of whether it was false or not.'" *Davis v. Borskey*, 94-2399 (La. 9/5/95), 660 So. 2d 17, 23 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964)). To establish a reckless disregard for the truth, the plaintiff must show that the false publication was made with a high degree of awareness of probable falsity, or that the defendant entertained serious doubt as to the truth of his publication. *Starr v. Boudreaux*, 2007-0652 (La. App. 1st Cir. 12/21/07), 978 So. 2d 384, 390 (citing *Tarpley v. Colfax Chron.*, 94-2919 (La. 2/17/95), 650 So. 2d 738, 740 (*per curiam*)). Further, conduct which would constitute reckless disregard is typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have put it in circulation. *Id.* (citing *Kennedy v. Sheriff of E. Baton Rouge*, 2005-1418 (La. 7/10/06), 935 So. 2d 669, 689).

As an initial matter, we find, considering the context of the statements at issue in the June 25, 2019 article, the average reader could have reasonably understood the statements to convey the defamatory meaning Justice Hughes alleges they impart to a reader. As noted by the trial court at the hearing on *The*

*Advocate*'s special motion to strike, the June 25, 2019 article states, in pertinent part:

> [Justice Hughes] failed that standard miserably two decades ago when he presided over a controversial custody case while he was, according to several people, romantically involved with one of its lawyers.

We find the factual connotation this statement conveys to the average reader of *The Advocate* is that Justice Hughes decided the merits of a custody dispute while dating a lawyer on the case. This factual connotation is defamatory and provably false. As is evident from the order permitting Durbin to withdraw as counsel for Kristin Fuselier in the Nicholson custody case, by March 24 1999, when Justice Hughes granted custody to Kristin Fuselier, Durbin had been out of the case for seven months. Additionally, instead of clarifying that at the time Justice Hughes ruled in favor of Kristen Fuselier, Durbin was no longer representing her, the article repeats the same false factual connotation in the excerpt cited by Justice Hughes:

> The facts that have made it into the light of day read like a horror story. In 1999, while on the state bench in Livingston, Hughes was romantically involved with lawyer [redacted], according to several people familiar with the situation. Even so, he didn't recuse himself from a custody case and related legal matters involving a five-year-old boy named Austin Nicholson. [Redacted] represented Austin's mother, who was fighting for custody even though her boyfriend, who would become her husband, had been accused of scalding Austin in a tub of hot water.
>
>                 \* \* \*
>
> Hughes refused to recuse himself and ruled in favor of Austin's mother, though child welfare officials strenuously[...]

(Emphasis and redactions in original).

Thus, we find Justice Hughes met his burden of demonstrating a likelihood of success as to falsity of the complained-of defamatory speech.

We likewise find Justice Hughes demonstrated a likelihood of success as to actual malice on the part of *The Advocate*. On June 23, 2019, *The Advocate*

16

published an article specifically noting, "[b]y the time of the custody hearing, overseen by Hughes, Durbin was no longer the lawyer of record. She'd officially left the case in August 1998, court documents show." Despite this fact, two days later, *The Advocate* published the June 25, 2019 article containing the false statements referred to above. *The Advocate* had actual knowledge that its June 25, 2019 article contained false statements of fact, based on its publication of the June 23, 2019 article.[9] In fact, the June 25, 2019 article notes that the facts cited therein were "brought to light this week by an Advocate investigation." *The Advocate* clearly possessed the documentation to present an accurate article about its investigation into Justice Hughes, but chose to publish the false defamatory statements. Accordingly, we find Justice Hughes has demonstrated a probability of success as to actual malice.

## Resulting Injury

In its second assignment of error, *The Advocate* contends the trial court erred in finding Justice Hughes had demonstrated a probability of success on his defamation action because he did not set forth proof that he suffered damages. *The Advocate* contends that Justice Hughes did not allege any damages in his petition and presented no evidence of damages. *The Advocate* points out that damages are not presumed in this case because it deals with a matter of public interest. This

---

[9] *The Advocate* argues this case is factually analogous to *New York Times, supra*. In *New York Times*, a police commissioner filed suit against the newspaper and others alleging an advertisement in the newspaper contained defamatory and false statements that referred to him. *Id.* at 256; 258-59. A jury found the statements were libelous per se and awarded the police commissioner damages. *Id.* at 262. The United States Supreme Court reversed, holding that a public official must demonstrate actual malice in order to prove defamation, and the police commission failed to present such proof. *Id.* at 285-86. In particular, the Supreme Court found unconvincing the argument that the newspaper had actual knowledge of the inaccuracies in the advertisement because it should have checked the accuracy of the advertisement against its own news files. The Supreme Court explained that the fact the newspaper had stories in its files did not establish that the newspaper "knew" the advertisement was false because knowledge of any falsity would have had to been brought to the attention of the people in charge of production of the advertisement. *Id.* at 287. The case *sub judice* does not involve an advertisement created by a third party; *The Advocate* created and published both the June 23, 2019 article and the June 25, 2019 article. Accordingly, we find *New York Times* to be distinguishable.

issue is also addressed in the *amicus curiae* brief submitted by the Reporters Committee for Freedom of the Press.

As discussed, pursuant to Article 971, Justice Hughes is required to demonstrate a probability of success on his defamation claim, and to maintain an action for defamation, a plaintiff has the burden of proving: (1) defamatory words; (2) publication; (3) falsity; (4) malice; and (5) resulting injury. *Breen*, 236 So. 3d at 638.

*The Advocate* cites *Lamz v. Wells*, 2005-1497 (La. App. 1st Cir. 6/9/06), 938 So. 2d 792, in support of its position that Justice Hughes was required to introduce evidence proving he suffered an injury based on the defamatory statements. In *Lamz*, the plaintiff sued the defendant for defamation based on statements made by the defendant when both parties were running for judicial office. *Id.* at 794. The race was controversial and contentious, and resulted in the election of the plaintiff by a small margin. *Id.* at 798. In response to the plaintiff's suit, the defendant filed a special motion to strike pursuant to Article 971. *Id.* at 794. The trial court granted the motion and dismissed the plaintiff's claims against the defendant. *Id.* at 795. On appeal, this court agreed that the plaintiff had failed to establish a probability of success on his defamation claims, finding nothing in the record showed that the publications were false, that the defendant acted with actual malice, or that the plaintiff "sustained any injury as a result of the publications at issue." *Id.* at 798. Accordingly, this court affirmed the trial court's judgment granting the defendant's special motion to strike and dismissing the plaintiff's action with prejudice. *Id.* at 798-99.

In *Saucier v. Washington*, 2017-556 (La. App. 3d Cir. 9/20/17), 229 So. 3d 19, another case cited by *The Advocate*, two neighbors were embroiled in contentious litigation and one neighbor, Saucier, sued the other, Washington, alleging he had made defamatory statements about Saucier in comments to an

18

online article, on the radio, and in campaign literature relating to a district attorney race. *Id.* at 25-26. Washington filed a special motion to strike pursuant to Article 971, alleging the statements were constitutionally protected. *Id.* at 26-27. The trial court denied Washington's special motion to strike, and he sought supervisory review of the trial court's judgment. *Id.* at 27. Initially, the Third Circuit Court of Appeal found Washington had met his burden of proving the allegedly defamatory statements involved matters of public interest and therefore the burden shifted to Saucier to prove a likelihood of success on his claims. *Id.* at 27-28. The court then explained that Saucier could not recover presumed or punitive damages without showing actual malice. *Id.* at 29 (citing *Romero*, 648 So. 2d at 870). The court further found that Saucier had provided no evidence of damages or injury, explaining that arguments and briefs do not constitute evidence. *Id.* Thereafter, the court also determined that Saucier failed to show the allegedly defamatory statements were false, or that they were made with actual malice. *Id.* at 30-32. Accordingly, the court granted Washington's special motion to strike, dismissed Saucier's suit with prejudice, and awarded Washington attorney's fees. *Id.* at 35.

As previously discussed, we find Justice Hughes met his burden of proving a likelihood of success as to both the falsity of the defamatory statements published by *The Advocate* in the June 25, 2019 article, and as to *The Advocate*'s publication of those false statements with actual malice. Thus, the instant case is distinguishable from *Lamz* and *Saucier*. Furthermore, Justice Hughes' petition, which was accompanied by a notarized verification signed by Justice Hughes attesting to the facts alleged therein, specifically alleges that he has suffered embarrassment and damage to his reputation as a result of the defamatory statements. As explained by the Louisiana Supreme Court in *Costello*, "[t]he injury resulting from a defamatory statement may include nonpecuniary or general damages such as injury to reputation, personal humiliation, embarrassment and

19

mental anguish even when no special damage such as loss of income is claimed." *Costello*, 864 So. 2d at 141. Furthermore, Article 971(A)(2) provides that a court, in making its determination of whether a plaintiff has demonstrated a probability of success on a defamation claim, "shall consider **the pleadings** and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (Emphasis added). Accordingly, based on the allegations contained in Justice Hughes' verified petition, and the defamatory statements contained in the June 25, 2019 article, we find Justice Hughes has demonstrated a likelihood of success as to resulting injury.

We also reject *The Advocate*'s argument that the trial court erred by finding Justice Hughes met his burden of demonstrating a likelihood of success as to the resulting injury caused by the defamatory statements because any damage to his reputation as a result of the challenged defamatory statements is "incremental." As described in *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991), the "incremental harm" doctrine measures the reputational damage caused by challenged defamatory speech against the harm resulting from the non-actionable remainder of the publication to determine whether the harm inflicted by the challenged speech is nominal and therefore not actionable. *Id.* at 522-23 (citing *The Libel-Proof Plaintiff Doctrine*, 98 Harv. L. Rev. 1909 (1985)). In *Masson*, the plaintiff, a well-known psychoanalyst, brought suit in a California federal court alleging quotations attributed to him in an article were false and defamatory. *Id.* at 499-502. The defendants, the publishers and author of the article, moved for summary judgment, arguing Masson, a public figure, could not prove actual malice. *Id.* at 508. The federal district court granted summary judgment, and the United States Ninth Circuit Court of Appeals affirmed, finding that while several of the quotations had been altered by the author of the article, Masson could not prove actual malice. The Ninth Circuit also found one passage

20

in particular, which contained a quotation attributed to Masson referring to himself as an "intellectual gigolo," was not defamatory, or, alternatively, would not be actionable under the incremental harm doctrine. *Id.* at 509.

The United States Supreme Court reversed summary judgment in favor of the defendants, finding the Ninth Circuit erred by concluding the term "intellectual gigolo" was not defamatory. *Id.* at 522. The *Masson* Court additionally found that application of the incremental harm doctrine was improper because the defamatory speech Masson complained about was the most damaging speech in the article. *Id.* Furthermore, the *Masson* Court found no support for application of the incremental harm doctrine under California law or the First Amendment, explaining, in pertinent part:

> Here, we reject any suggestion that the incremental harm doctrine is compelled as a matter of First Amendment protection for speech. The question of incremental harm does not bear upon whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not. As a question of state law, on the other hand, we are given no indication that California accepts this doctrine, though it remains free to do so. Of course, state tort law doctrines of injury, causation, and damages calculation might allow a defendant to press the argument that the statements did not result in any incremental harm to a plaintiff's reputation.

*Id.* at 523.

As stated in *Masson*, the First Amendment does not obligate this court to accept and apply the incremental harm doctrine, and *The Advocate* concedes that no Louisiana cases exist applying the doctrine. The cases cited by *The Advocate* in support of its argument that this court should invoke the doctrine of incremental harm all arise from other jurisdictions.[10] We find no support for adoption of the doctrine under Louisiana law. As noted, the tort of defamation emanates from La. C.C. art. 2315, which provides, in pertinent part, "[e]very act whatever of man that

---

[10] *See Cardillo v. Doubleday & Co.*, 518 F. 2d 638, 639 (2d Cir. 1975); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 388 (S.D.N.Y. 1998); *Herbert v. Lando*, 781 F. 2d 298, 302 (2d Cir. 1986) *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545; *Ferreri v. Plain Dealer Publ'g Co.*, 142 Ohio App. 3d 629, 756 N.E. 2d 712, 723 (2001).

causes damage to another obliges him by whose fault it happened to repair it." We find adoption of the incremental harm doctrine to be inconsistent with the spirit and meaning of La. C.C. art. 2315. Moreover, we note, even were this court to adopt the incremental harm doctrine, which we expressly decline to do, the statements challenged by Justice Hughes in the June 25, 2019 article are the most disparaging in the article. Thus, application of the incremental harm doctrine would not alter our finding that Justice Hughes demonstrated a likelihood of success as to the resulting injury of the defamatory statements.

## Attorney's Fees

In its fourth assignment of error, *The Advocate* asserts that the trial court erred by failing to dismiss Justice Hughes' defamation action, and erred by failing to award *The Advocate* attorney's fees pursuant to Article 971. As stated above, Article 971(B) provides, in pertinent part, that "a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs." The trial court awarded Justice Hughes $5,000.00 in attorney fees as the prevailing party on *The Advocate*'s special motion to strike.

As discussed, we find the trial court did not err by denying *The Advocate*'s special motion to strike because Justice Hughes met his burden of demonstrating a likelihood of success as to his defamation action. Accordingly, *The Advocate* is not entitled to attorney's fees under Article 971(B).

On March 11, 2021, Justice Hughes filed an answer to this appeal, seeking an increase in the amount of attorney's fees awarded by the trial court from $5,000.00 to $10,000.00, and also requested attorney's fees in the amount of $7,500.00 for the defense of this appeal.

On October 14, 2021, Justice Hughes filed a motion to amend answer to appeal, seeking to file an amended answer requesting additional attorney's fees based on the complexity of the issues involved in this matter.

On October 28, 2021, *The Advocate* filed a motion to strike Justice Hughes' motion to amend answer to appeal, arguing the motion is untimely, and was not served on counsel for *The Advocate*. Additionally, *The Advocate* asserts this court should strike Justice Hughes' amended answer to appeal because it addresses the quantum of attorney's fees awarded by the trial court, and there is no record evidence to support an increase in attorney's fees at the trial court level.

Louisiana Code of Civil Procedure article 2133 provides, in pertinent part:

> A. An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. **In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later.** The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.

(Emphasis added).

Justice Hughes' original answer to this appeal was timely filed within 15 days of the lodging of the record, as required by La. C.C.P. art. 2133. However, Justice Hughes' motion to amend answer to appeal was filed almost seven months after the expiration of the 15-day time delay set forth in La. C.C.P. art. 2133. There exists no statutory authority to allow the amendment of an answer outside the 15-day time limit provided in La. C.C.P. art. 2133. *Landry v. Nobility Homes, Inc.*, 488 So. 2d 726, 728 (La. App. 3d Cir. 1986), *writ denied*, 491 So. 2d 21 (La. 1986). Accordingly, we deny Justice Hughes' motion to amend answer to appeal. As such, we deny *The Advocate*'s motion to strike Justice Hughes' motion to amend answer to appeal as moot.

The trial court has much discretion in fixing an award of attorney fees, and its award will not be modified on appeal absent a showing of an abuse of discretion. *Silwad Two, L.L.C. v. I Zenith, Inc.*, 2012-0282 (La. App. 1st Cir. 12/21/12), 111 So. 3d 405, 411. Factors to be taken into consideration in

determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances made; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. *See* Rule 1.5(a) of the Rules of Professional Conduct; *State, Dep't of Transp. and Dev. v. Williamson*, 597 So. 2d 439, 442 (La. 1992).

Based on our consideration of the aforementioned factors, and our review of the record and the legal services involved, we do not find the trial court abused its discretion by awarding $5,000.00 in attorney's fees to Justice Hughes. Accordingly, we deny Justice Hughes' answer to appeal in part. However, we find, as the prevailing party, Justice Hughes is entitled to attorney's fees for the defense of this appeal. *See Williams v. Nexstar Broadcasting, Inc.*, 11-887 (La. App. 5th Cir. 4/10/12), 96 So. 3d 1195, 1202. Accordingly, we grant Justice Hughes' answer to appeal in part, and award him $7,500.00 in attorney's fees for legal services rendered in defense of this appeal.

## CONCLUSION

For the above and foregoing reasons, we affirm the trial court's November 23, 2020 judgment denying the special motion to strike filed by defendant, Capital City Press, L.L.C. d/b/a The Advocate, and awarding plaintiff, Jeff Hughes, $5,000.00 in attorney's fees and court costs. The answer to appeal is denied in part and granted in part, and we award appellee, Jeff Hughes, $7,500.00 in attorney's fees for defense of this appeal. The motion to amend answer to appeal filed by appellee, Jeff Hughes, is denied. The motion to strike filed by appellant, Capital City Press, L.L.C. d/b/a The Advocate, is denied. All costs of this appeal are assessed to appellant, Capital City Press, L.L.C. d/b/a The Advocate.

**AFFIRMED; ANSWER TO APPEAL GRANTED IN PART; MOTION TO AMEND ANSWER TO APPEAL DENIED; MOTION TO STRIKE DENIED; AWARD OF ATTORNEY FEES RENDERED.**

25